# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| J & J Sports Productions, Inc., | Case No. 2:18-cv-00748-JAD-BNW |
| Plaintiff, | **Report & Recommendation** |
| v. | |
| Golden Penny Industries, LLC, et al., | |
| Defendants. | |

In this signal piracy case, plaintiff J&J Sports Productions, Inc. moves for summary judgment against defendant Jerome Kosak. ECF No. 27.[1] The motion is unopposed. The Court believes that J&J has carried its summary judgment burden on the first of its two claims, and the Court therefore recommends that the motion be granted in part and denied in part.

**I.    Procedural background**

J&J brought its complaint against Kosak and Golden Penny Industries, LLC ("GPI"). ECF No. 1 at 1. J&J asserts two claims under the Communications Act: (1) Count I is for violation of 47 U.S.C. § 605, and (2) Count II is for violation of 47 U.S.C. § 553. *Id.* at 4, 7.

Apart from Kosak's answer to J&J's complaint and response to the Court's order to show cause, *see* ECF Nos. 4 and 16, neither defendant has participated in this case. This case, further, is stayed as it pertains to GPI, which filed for Chapter 7 bankruptcy in July 2019. ECF No. 23.

J&J filed its unopposed motion for summary judgment in December 2019. ECF No. 27. The Court notes that Kosak provided a notice of change of address in October 2018. ECF No. 16. J&J duly served its summary judgment motion and other relevant documents upon Kosak at that

---

[1] The motion for summary judgment was referred to the undersigned magistrate judge for a report and recommendation to the district judge, in accordance with 28 U.S.C. § 636(b)(1)(B).

1   address by depositing the same in a sealed envelope, postage prepaid, in the United States Mail.

2   *See* Fed. R. Civ. P. 5(b)(2); ECF No. 27 at 24; ECF No. 34 at 2.[2]

## II.  Undisputed facts

### A.  J&J and "the Program"

J&J is a closed-circuit distributor of sports and entertainment programming.  (ECF No. 27-2 (Gagliardi Aff. ¶ 3, Ex. 2)).  In April 2015 J&J purchased the exclusive commercial exhibition licensing rights to a program entitled *"The Fight of the Century," Floyd Mayweather, Jr. v. Manny Pacquiao Championship Fight Program* (the "Program").  *Id.*  The Program, which aired on May 2, 2015, included the main event bout between the Program's eponymous boxers, the undercard bouts preceding the main event, and the commentary expressed in the Program's television broadcast.  *Id.*  J&J's exclusive licensing rights are set forth in a written agreement between J&J and the Program's promoters.  *Id.* Ex. 1 (the "Agreement").

J&J marketed and sublicensed the right to broadcast the Program to commercial establishments, including casinos, racetracks, bars, and nightclubs.  *Id.* ¶ 3.  In exchange for the ability to lawfully broadcast the program, commercial establishments were required to pay a commercial sublicense fee to J&J.  *Id.* ¶ 12.  The fee amount was based on the commercial establishment's capacity.  *Id.* ¶ 12; *id.* Ex. 3.

---

[2] The Court further notes that the record lacks a proof of service certifying that Kosak was duly served with the complaint.  The defenses of insufficient process and insufficient service of process can be raised in a responsive pleading or motion. Fed. R. Civ. P. 12(b)(4)–(5).  If these defenses are raised by motion, the motion must be made "before pleading if a responsive pleading is allowed." *Id.*  A defendant waives these specific defenses if she fails to raise them in a motion under Rule 12, responsive pleading, or amendment allowed by Rule 15(a)(1). Fed. R. Civ. P. 12(h)(1).  "[I]n the absence of proper service of process, the district court has no power to render any judgment against the defendant's person or property unless the defendant has consented to jurisdiction **or waived the lack of process.**" *S.E.C. v. Ross*, 504 F.3d 1130, 1138–39 (9th Cir. 2007) (emphasis added).  Here, Kosak filed a responsive pleading and did not raise a defense for insufficient process or insufficient service of process.  The time for Kosak to amend his responsive pleading has lapsed, *see* Fed. R. Civ. P. 15(a)(1), and Kosak can no longer raise the defense by motion, *see* Fed. R. Civ. P. 12(h)(1).  Kosak has therefore waived these defenses and the Court may exercise personal jurisdiction over him.  *See Schnabel v. Lui*, 302 F.3d 1023, 1033–34 (9th Cir. 2002) (explaining that a defendant "waived any defense of lack of personal jurisdiction, insufficiency of process, or insufficiency of service of process by failing to raise the defense in its first motion under Rule 12(b).").

The satellite signal containing the Program was not available to or intended for use by the general public. *Id.* ¶ 15. Thus, to safeguard against the unauthorized receipt or interception of the Program, the satellite transmission containing the Program was encrypted or scrambled. *Id.* If J&J authorized an establishment to receive the program, J&J would direct the establishment's cable or satellite provider to unscramble the satellite signal. *Id.* Because J&J held the exclusive commercial distribution rights to the Program, the Program was not available to commercial establishments except through agreement with J&J. *Id.* ¶ 3.

**B.    The Bar**

J&J did not sublicense the Program to Kosak, GPI, or its commercial establishment: Rebel Republic, then-located at 3540 West Sahara Avenue, Suite E1, Las Vegas, Nevada 89102 (the "Bar"). *Id.* ¶ 3. Kosak admitted to being the owner and operator of GPI and the Bar and to having dominion, control, oversight, and management over the Bar. ECF No. 4 at 1–2.

J&J hired four investigators to visit the Bar on the night the Program aired. ECF No. 27 at 3. None of the investigators paid a cover charge. *See* ECF No. 34-1.

Investigator Gerald Andrews arrived at the Bar first, at around 5:45 PM, and he counted eight patrons. *Id.* at 15. Andrews counted close to twenty televisions, including four above the Bar's service bar. *Id.* According to Andrews, the Program began at 6:00 PM with a copyright warning and introductory commentary by the Program's announcers. *Id.* Andrews left the bar at 6:10 PM. *Id.*

Investigator Lawrence Sanchez was next, and he counted approximately 28 patrons in the Bar at 6:45 PM. *Id.* at 9. Sanchez attests that the Bar's capacity was 125 persons and that there were 17 televisions throughout the establishment. *Id.* He observed an undercard bout, noted the screens showing the Program were experiencing connection issues, and counted 40 patrons when we left the Bar at 7:10 PM. *Id.* at 10.

Investigator Magic Sixx followed. ECF No. 34-1 at 4. Ms. Sixx arrived at 7:40 PM and observed a large banner advertising the Program affixed to the Bar's front roof. *Id.* Ms. Sixx counted 50 customers and 18 televisions—all approximately 40 inches—inside the Bar. *Id.* at 4, 5. According to Ms. Sixx, half of the televisions were tuned to the Program. *Id.* at 5. For

those televisions tuned to the Program, the signal reception was "poor" and the lower area of the televisions listed a "contact Dish" prompt. *Id.* The images on the television would freeze for around ten seconds approximately every two minutes before becoming heavily pixelated and disjointed. *Id.* The Bar's customers complained about the poor picture quality, and the Bar explained that this was due to too many persons receiving the satellite signal. *Id.* The televisions **not** depicting the program lacked similar reception issues. *Id.*

Ms. Sixx observed one of the Program's undercard bouts. *Id.* She took two more headcounts before departing the bar: there were 65 customers in the Bar at 8:29 PM and 80 at 8:34 PM. *Id.*

Ms. Pamela Purdy was the final auditor to enter the bar. *Id.* at 12. She arrived at 8:53 PM and likewise counted eighteen screens, which included seventeen televisions and a screen projected onto a wall adjacent to the Bar's exit. *Id.* Ms. Purdy noted that each television was marked with a number tag, and by her count there were nine screens showing the Program. *Id.* at 12. Like Ms. Sixx, Ms. Purdy observed that the screens depicting the Program "kept freezing." *Id.*

Ms. Purdy noted that the Bar's capacity was 120 persons. *Id.* at 13. Ms. Purdy counted the Bar's patrons three times before she left at 9:27 PM. *Id.* She counted 108, 108, and 115 patrons. *Id.*

Based on the Bar's capacity, the price for a sublicensing fee to broadcast the Program was $6,000.00. ECF No. 27-2, Ex. 3.

**III. Legal standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact," therefore entitling the movant to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of articulating the basis for its motion and identifying the portions of the record that the movant believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant meets its initial responsibility, the burden shifts to the

nonmovant to "produce evidence of a genuine dispute of material fact that could satisfy its burden at trial." *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018). To resolve a summary judgment motion, the Court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The Ninth Circuit has made clear that the trial court may not grant a summary judgment motion merely because it is unopposed. *Heinemann v. Setterberg*, 731 F.3d 914, 917 (9th Cir. 2013). Instead, the nonmovant's failure to respond to a fact asserted in the motion "permits a court to consider the fact undisputed." *Id.* (citing Fed. R. Civ. P. 56(e)(2)).

If summary judgment is sought against a pro se defendant, the court considers the defendant's contentions offered in motions and pleadings, so long as the contentions are made on personal knowledge, set forth facts that would be admissible as evidence, and were made under penalty of perjury. *Xue Bao Chen v. Viduarri*, No. 2:12-cv-2163-JAD-PAL, 2014 WL 5307928, at *2 (D. Nev. 2014) (citing *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004)). Finally, pro se filings are liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

**IV. Discussion**

**A. Whether J&J had the right to sublicense the Program's distribution in Clark County**

The Agreement between J&J and the Program's promoters grants J&J the exclusive license to exhibit the Program in the United States but specifically excludes "exhibition rights in Clark County, Nevada." ECF No. 27-2 at 11.[3] J&J argues, however, that it and the promoters modified the contract to lift the territorial restriction on J&J's rights. ECF No. 27 at 12.

According to J&J, the territorial restriction was imposed to protect ticket sales to Program-related events in Las Vegas, Nevada, including the live event at the MGM Grand Garden Arena. ECF No. 27-2 ¶ 7. Following the ratification of the Agreement, the Program-

---

[3] Joseph M. Gagliardi, president of J&J, affirmed that the contract appended to his affidavit is a true copy of the Agreement between J&J and the Program's promoters. ECF No. 27-2 ¶ 4.

related events enjoyed substantial ticket sales, which obviated the purpose for the territorial restriction. *Id.*; ECF No. 27 at 12. Thus, the promoters authorized J&J to license the Program's exhibition to commercial establishments in Las Vegas. ECF No. 27-2 ¶ 7. J&J did so. *Id.*

To determine whether J&J in fact had the legal right to license the exhibition of the Program in Las Vegas, the Court must resolve whether the J&J and the promoters waived the territorial restriction. The Agreement contains no choice-of-law provision. Under the Restatement (Second) of Conflict of Laws, the Court applies the law of the state which has "the most significant relationship to the transaction." *Commercial Ins. Co. of Newark, N.J. v. Pacific-Peru Const. Corp.*, 558 F.2d 948, 952 (9th Cir. 1977).[4] The most significant relationship is analyzed according to the following criteria: (1) the place of contracting, negotiating, and performance of the contract; (2) the location of the contract's subject matter; and (3) the domicile, nationality, place of incorporation, and place of business of the parties. *Id.*

Here, the Agreement provides that the promoters are located in Nevada, that J&J is located in California, and that the Program's bouts were set to occur in Las Vegas. ECF No. 27-2 at 11. It is evident to the Court that the Restatement points to either California or Nevada law, but the Court need not resolve that question because the result is the same under either state's law.

It is well settled that under California law a contracting party may waive "conditions" or "provisions" placed in a contract "solely for the party's benefit." *Wyler Summit Partnership*, 135 F.3d 658, 662 (9th Cir. 1998) (citing *Sabo v. Fasano*, 201 Cal. Rptr. 270, 271 (2d Dist. 1984); *Doryon v. Salant*, 142 Cal. Rptr. 378, 381 (2d Dist. 1977)) (citations omitted). The inquiry on whether a provision was originally included in the contract for a party's benefit focuses on the parties' intent at the time of contacting. *Id.* at 663.

Here, J&J represents in a sworn affidavit by its president that the territorial limitation was included in the Agreement to protect ticket sales for the Program's promoters. The court believes the territorial limitation plainly protects the Program's promoters, who were able to sell tickets to

---

[4] Because the Court has federal-question jurisdiction, the Court applies federal common law to determine which choice-of-law rule applies. *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006). Federal common law points to the Restatement (Second) of Conflict of Laws. *Id.*

Program-related events without competing with Clark County commercial establishments showing the Program at their places of business. The supposed waiver of the territorial limitation plainly benefitted J&J, which was then able to earn money by sublicensing the exhibition of the Program to commercial establishments in Clark County. Further, J&J represents that it sublicensed the Program in Clark County "with the [promoters'] full knowledge, authorization, and consent." ECF No. 27-2 ¶ 7. The Court, therefore, believes that the territorial limitation was included solely for the promoters' benefit and that under California law the Program's promoters effected a waiver of the territorial limitation. Accordingly, to the extent California law governs the Agreement, J&J did in fact have the ability to license the Program's exhibition to commercial establishments in Clark County.

The result is the same under Nevada law, which provides that contracting parties "may mutually consent to enter into a valid agreement to modify a former contract," and that the modification can be "implied from conduct consistent with an asserted modification." *Clark Cnty. Sports Enters. v. City of Las Vegas*, 606 P.2d 171, 172 (Nev. 1980). Here, J&J states that once the promoters sold enough tickets to the Program's live event, it began to license the Program's exhibition to establishments in Clark County. J&J provided a list of nineteen establishments that entered into a licensing agreement with J&J for the Program's exhibition. ECF No. 27-2 at 19. J&J represents that these agreements were possible only because of the promoters' "prior authorization for such [agreements]." ECF No. 27 at 13. Thus, the Court believes that, under Nevada law, J&J's and the promoters' conduct evinces they mutually consented to modify the Agreement to allow J&J to license the Program's exhibition to commercial establishments in Clark County. Accordingly, whether Nevada or California law applies, J&J was authorized to sublicense the Program's exhibition in Clark County.

The Court turns now to whether J&J has established liability.

### B.     47 U.S.C. §§ 553 and 605

Section 553 is a provision of the Communications Act that "prohibits both illegally receiving cable programming and helping others to illegally receive cable programming by manufacturing or distributing equipment that allows a person to receive cable programming

without authorization." 47 U.S.C. § 553(a)(1); *J&J Sports Prods., Inc. v. Johns*, 2015 WL 13236876, at *2 (E.D. Cal. Dec. 4, 2015).

Section 605, in turn, "prohibits the unauthorized receipt and use of radio communications for one's own benefit or for the benefit of another" not entitled to receipt. *DirecTV, Inc. v. Webb*, 545 F.3d 837, 844 (9th Cir. 2008) (citing 47 U.S.C. § 605(a)). There are "potentially intricate issues of overlap and distinction" between §§ 553 and 605. *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 349 n.1 (9th Cir. 1999). But the term "communications" has been authoritatively construed in our circuit to "include satellite television signals." *Id.* (citing *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 926 (9th Cir. 2006); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 911–12 (6th Cir. 2001)).

Sections 553 and 605 each provide a private civil cause of action against violators. 47 U.S.C. §§ 553(c)(1), 605(e)(3)(A). "Both are strict liability statutes." *Johns*, 2015 WL 13236876 at *3.[5] And most courts have found that § 553 speaks to interception of signals broadcast through coaxial cable systems, while § 605 speaks to interception through the air via radio and satellite. *Kingvision Pay Per View, Ltd. v. Guzman*, 2008 WL 1924988, at *1 (D. Ariz. Apr. 30, 2008).

There is a split of authority regarding whether a violation of § 553(a)(1) can likewise constitute a violation of § 605(a). *J&J Sports Prods., Inc. v. Torres*, 2011 WL 6749817, at *4 (E.D. Cal. Dec. 22, 2011). The Court, however, need not resolve that issue because J&J asks the Court to find that Kosak violated § 605(a).[6] Therefore, the Court will recommend to the district judge that she deny the motion for summary judgment on J&J's § 553 claim.

…

…

…

---

[5] *Accord G&G Close Circuit Events, LLC v. Castillo*, 327 F. Supp. 3d 1119, 1128 (N.D. Ill. 2018) (construing § 605); *Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 274 (E.D. Pa. 2014) (construing § 553); *J&J Sports Prods., Inc. v. Allen*, 2014 WL 12567151, at *5 (E.D. Tex. June 27, 2014) (collecting cases on both § 553 and 605).

[6] Moreover, two of J&J's investigators observed that the Bar's television screens prompted the viewer to contact "Dish," which is a satellite provider. ECF No. 27-2 at 13, 21.

### C. Section 605(a) liability

#### a. Individual liability under § 605(a)

As discussed above, this matter is stayed as it pertains to GPI. Therefore, Kosak is the only defendant against whom J&J moves for summary judgment. To establish individual liability against Kosak under § 605(a), J&J must show that Kosak "had a right and ability to supervise the violations and that he had a strong financial interest in such activities." *J&J Sports Prods., Inc. v. Mikhael*, 2016 WL 2984191, at *2 (C.D. Cal. May 19, 2016) (quotations omitted).

Here, in his answer to J&J's complaint, Kosak admitted that on the night of the Program's exhibition he owned and had "dominion, control, oversight[,] and management" over the Bar. ECF No. 4 (admitting to ECF No. 1 ¶¶ 6, 13 and part of ¶ 8 (J&J's compl.)).[7] Further, because Kosak was the Bar's owner, it follows that as a "consequence of everyday business incentives," he reaps the benefit of "enhanced profits earned from attracting patrons with a bootlegged program." *Joe Hand Promotions, Inc. v. Tickle*, 2016 WL 393797, at *14 (M.D. Pa. Feb. 2, 2016). Thus, to the extent that there exists a § 605(a) violation, the Court recommends that Kosak be found individually liable because he had the ability to supervise the violations and had a direct financial interest in those violations.[8]

…

…

---

[7] A statement in an answer is a judicial admission. *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). Judicial admissions "are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Id.* These admissions are "conclusively binding on the party who made them" and can support summary judgment. *Id.*; *Bd. of Tr. Of the Ken Lusby Clerks & Lumber Handlers Pension Fund v. Piedmont Lumber & Mill Co.*, 2015 WL 5461561, at *4 (N.D.C Cal. Sept. 16, 2015) (holding that there was no genuine issue regarding ownership of certain property because defendant admitted to that fact in her answer).

[8] The Court also notes that the Nevada Secretary of State's website reflects that Kosak is the Bar's registered agent and the sole member of its owner, GPI. ECF No. 34-1 at 18–20. The Nevada Secretary of State's record is "not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Pennel v. Am. Addiction Ctrs.*, 2020 WL3046535, at *1–2 (citing Fed. R. Evid. 201(b)(2)). The Court may therefore take judicial notice of Kosak's status as GPI's sole member and registered agent because it is set forth in a public record. *See id.* (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006)). Individual liability has been found possible where a defendant was a member and registered agent of an LLC that violated § 605. *J&J Sports Prods., Inc. v. Mikhael*, 2016 WL 2984191, at *2 (C.D. Cal. May 19, 2016).

**b. Whether a § 605(a) violation occurred**

To establish a § 605(a) violation, J&J must show: (1) that they are "a person aggrieved" under § 605; (2) that the Program was exhibited in the Bar; (3) that J&J did not authorize the exhibition of the Program; and (4) that the Program was shown to at least one other person. 47 U.S.C. §§ 605(a), (e)(3)(A); *Joe Hand Promotions, Inc. v. Ok Cha Vanhoozer*, 2014 WL 12543019, at *2 (W.D. Tex. Apr. 30, 2014).

Here, J&J has offered competent evidence to establish all four elements of a § 605(a) violation. For the first element, a "person aggrieved" includes "any person with proprietary rights in the intercepted communication." 47 U.S.C. § 605(d)(6). To establish this, J&J offers the Agreement, which plainly states that J&J was granted "the exclusive license" to exhibit the Program at commercial exhibition outlets, "such as bars, clubs, lounges, restaurants[,] and the like." ECF No. 27-2 at 11. The Court has already found that J&J's exclusive commercial distribution rights encompass Clark County. Because J&J held the exclusive commercial distribution rights for the Program, J&J had "proprietary rights" in the Program. Therefore, J&J is an "aggrieved person" under § 605(a). *J&J Sports Prods., Inc. v. De La Cerda*, 2013 WL 5670877, at *4, 6 (E.D. Cal. Oct. 16, 2013) (finding plaintiff to be an "aggrieved person" under § 605(a) because it had the "exclusive nationwide distribution rights" to an intercepted program).

Further, the Court finds that J&J has established that the Program was exhibited at the Bar. For this, J&J relies on the sworn and detailed affidavits of four investigators who, from 5:45 PM to 9:27 PM on May 2, 2015, visited the Bar and observed the Program being displayed on approximately 9 of the Bar's 18 televisions. This is sufficient to carry J&J's burden at summary judgment. *Joe Hand Promotions, Inc. v. Albright*, 2013 WL 2449500, at *4 (E.D. Cal. June 5, 2013) (finding a single investigator's affidavit sufficient to establish that a program was exhibited at defendant's commercial establishment).

Third, J&J has established that the Program was aired at the Bar without J&J's permission. Because J&J had the exclusive ability to license the Program's exhibition at commercial establishments, the only means for the Bar to exhibit the program was through a contract with J&J. *See* ECF No. 27-2 ¶ 3. J&J did not contract with Kosak, GPI, or the Bar.

Thus, when the Bar aired the Program on May 2, 2015, it did so without J&J's permission. Moreover, two of J&J's investigators observed poor signal reception on the televisions depicting the Program. ECF No. 34-1 at 5, 7. There were no reception issues on the televisions depicting something **other than** the Program. *Id.* at 5–6. And, on those televisions depicting the Program, investigators noted a blue panel prompting viewers to contact "Dish" (*id.* at 5–6, 9), which is a direct-satellite supplier (ECF No. 27-2 at 13, 21).[9] The Court believes based on this evidence that the Bar received the Program, without permission, via "Dish," a direct-satellite supplier.

The Court further believes that the receipt of satellite service at the bar, coupled with the absence of an authorization by J&J for the Bar to exhibit the Program, is sufficient to establish that J&J intercepted the Program via satellite service without J&J's authorization. Other courts have found similarly. *See, e.g.*, *Joe Hand Promotions, Inc. v. Roseville Lodge No. 1293*, 161 F. Supp. 3d 910, 915 (E.D. Cal. 2016) ("The undisputed evidence—specifically, the lack of Plaintiff's authorization and the satellite service at Defendant's establishment—is sufficient to establish Defendant's unauthorized interception . . . via satellite service."); *J&J Sports Prods., Inc. v. Thang*, 161 F. Supp. 3d 910, at *3 (E.D. Cal. Jan. 30, 2018) ("It is undisputed that Plaintiff had the exclusive commercial distribution rights to the Program and that Defendants showed the program at their establishment without receiving authorization from or paying the licensing fee to Plaintiff. . . . That circumstantial evidence is enough to establish a violation of § 605.").

Finally, for the fourth element, the Court believes that the Bar exhibited the Program to its patrons, which ranged anywhere from 8–115 persons throughout the night.

Because the Court believes that J&J has met all four elements, the Court will recommend to the district judge that she find that J&J has established the existence of a § 605(a) violation. Further, because Kosak had supervisory authority over the Bar during the Program's exhibition and a direct financial incentive in that exhibition, the Court will recommend to the district judge that she find Kosak individually liable for this violation.

---

[9] The Court notes that J&J's motion refers to a photograph of a satellite dish on the Bar's roof, but no such photograph was included in J&J's exhibits. The Court therefore does not rely on this statement.

**D.    Damages**

A § 605(a) damages analysis has two parts.  At the first part, the Court may award—"at the election of the aggrieved party"—either actual or statutory damages.  47 U.S.C. § 605(e)(3)(c)(i).  At the second part, if the Court finds that the § 605(a) violation was done "willfully and for purposes of direct or indirect commercial advantage or financial gain," the Court, "in its discretion," may increase the award of damages by an amount of not more than $100,000 for each violation.  *Id.* § 605(e)(3)(c)(ii).

**1.    Statutory damages**

Section 605 authorizes an award of statutory damages of "not less than $1,000 or not more than $10,000" for each violation of § 605(a), "as the Court considers just." *Id.* § 605(3)(3)(c)(i)(II).  J&J seeks the maximum $10,000 amount for Kosak's violation of § 605(a).

The court in *Kingvision Pay-Per-View, Ltd. v. Blackman*, 102 F. Supp. 2d 1196, 1198 (N.D. Cal. 2000) awarded the $1,000 minimum, based on its conclusion that "distributors should not be overcompensated and statutory awards should be proportional to the violation."  The court noted that "a higher statutory award may be justified in cases where defendants are repeat offenders who have pirated similar Programs on previous occasions, and who need an especially severe financial deterrent." *Id.* at 1198–99.  But "in the absence of unusual or particularly egregious circumstances under which a defendant broadcasts the fights . . . it would be inappropriate to award the statutory maximum."  *Don King Prods./Kingvision v. Maldonado*, 1998 WL 879683 (N.D. Cal. Dec. 11, 1998) (citing *Joe Hand Promotions v. Burg's Lounge*, 955 F. Supp. 42, 44 (E.D. Pa. 1997)).

The Court notes that, based on J&J's evidence, the price for a license to exhibit the Program in the Bar was $6,000.  ECF No. 27-2 at 21.  J&J urges, however, that a statutory award equal to the amount of the licensing fee would undercompensate J&J.

The Court agrees.  A damages award "based exclusively on the licensing fees would undercompensate the plaintiff because the availability of unauthorized access to the program reduces demand and depresses the prices" that can be charges for sublicenses.  *Kingvision Pay-*

*Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 442 (S.D.N.Y. 2001). Thus, the Court finds that the $6,000 licensing fee is an appropriate starting point but insufficient to compensate J&J. *See J&J Sports Prods. v. Lorenzana*, 2014 WL 3044566, at *3 (M.D. Cal. May 13, 2014) ("the Court may consider the cost of commercial license for the program at issue").

Some courts have calculated damages based in part on a desire to effect general and specific deterrence. *See, e.g.*, *Joe Hand Promotions, Inc. v. Gamino*, 2011 WL 66144, at *4 (E.D. Cal. Jan. 10, 2011) ("the amount of damages awarded should be in an amount that is adequate to deter these defendants and others from committing similar acts in the future."). Here, the Court recommends to the district that she, in her discretion, find that an award of $8,000 in statutory damages is just because it sufficiently compensates plaintiff and acts as a deterrent against future unlawful conduct. Ultimately, the Court declines to recommend the $10,000 maximum figure because the record lacks any indication that Kosak or the Bar are repeat offenders or that Kosak charged a cover or a premium for food and drinks.[10]

In *McCausland*—which J&J relies on in part for its $10,000 request—the Court awarded the maximum $10,000 statutory amount because of "the apparent need" to send a strong deterrent signal. *McCausland*, 2012 WL 113786 at *3. However, the Court's recommendation here for $8,000 in statutory damages already accounts for the need for a deterrent signal. Further, the Court in *McCausland* "merely accept[ed] plaintiff's request for $10,000 in statutory damages," *id.*, which the Court declines to do here.

The Court turns now to the propriety of enhanced statutory damages.

### 2.   **Enhanced statutory damages**

The Communications Act permits the court to award enhanced statutory damages in its discretion and in an amount "not more than $100,000" if it finds that the § 605(a) violation was

---

[10] J&J asks the Court to consider that when J&J's investigator inquired about whether the Bar intended to show the Program, a Bar employee answered that "they had been 'blocked from showing the fight, but they were still showing it.'" ECF No. 34-1 at 4. However, this statement is hearsay because it was not made by the declarant and J&J offers it to prove the truth of the matter asserted. Fed. R. Evid. 801(c). J&J offers no hearsay exception. Therefore, the statement "is inadmissible hearsay evidence and cannot be considered on a motion for summary judgment." *Smith v. Pacific Bell Telephone Co., Inc.*, 649 F. Supp. 2d 1073, 1088 (E.D. Cal. 2009).

done "willfully and for purposes of direct or indirect commercial advantage or private financial gain." 47 U.S.C. § 605(e)(3)(C)(ii). To make this determination, the court weighs a nonexclusive list of factors (i.e., the "*Kingvision* factors"): (1) whether defendant is a repeat violator of the Communications Act, (2) the extent of defendant's unlawful monetary gains, (3) actual damages to the plaintiff, (4) whether defendant advertised the broadcast of the intercepted program, (5) whether defendant charged a cover to enter the establishment to view the intercepted program, and (6) whether defendant charged a premium for food or drinks during the event. *Joe Hand Promotions, Inc. v. Gonzales*, 2015 WL 507397, at *5 (E.D. Cal. Feb. 6, 2015) (citation omitted).

As an initial (and practical) matter, the Court notes that satellite signals typically "do not descramble spontaneously." *See Joe Hand Promotions, Inc. v. Wing Spot Chicken & Waffles, Inc.*, 920 F. Supp. 2d 659, 668 (E.D. Va. 2013) (citing *Time Warner Cable v. Googies Luncheonette*, 77 F. Supp. 2d 485, 490 (S.D.N.Y, 1999)).[11] Instead, when a commercial establishment exhibits an intercepted program to its patrons at no cost, this is sufficient for the Court to conclude "that the defendant acted willfully for commercial advantage and private financial gain." *Id.* That is precisely what happened here. The Court therefore believes that—like the interception in *Wing Spot*—the interception of the Program here required "an affirmative action by the defendant," and that this action was done for commercial advantage or private financial gain  *See id.*; *see also J&J Sports Prods. v. Betancourt*, 2009 WL 3416431, at *4 (S.D. Cal. Oct. 20, 2009) ("an establishment seeks to attract patrons by broadcasting the fight, which results in increased food and drink sales. By displaying entertainment . . . the owner . . . is clearly acting for commercial gain.").

Further, after considering the *Kingvision* factors, the Court believes that $30,000 in enhanced statutory damages are warranted. For the first factor, however, the record does not evince that Kosak is a repeat offender of the Communications Act.

---

[11] *See also J&J Sports Prods. v. Montecinos*, 2010 WL 144817, at *5 (N.D. Cal. Jan. 11, 2010) ("enhanced damages are appropriate given the impossibility that plaintiff's signal could be innocently or accidentally intercepted").

For the second factor, J&J has not provided evidence with its motion to show the extent of Kosak's unlawful monetary gains. J&J's investigators observed that toward the end of the Program's exhibition the Bar hosted 115 patrons and was therefore nearly at its 120- or 125-person capacity. This amount of patrons gestures toward unlawful monetary gains. However, the record lacks any evidence that would allow the Court to compare the Bar's patronage on the night of the Program's telecast to any other comparable evening at the Bar. Thus, the Court is unable to assess the extent of the Bar's monetary gains and this factor cuts against enhanced damages.

Turning to the third factor, J&J has established that based on the Bar's 120- or 125-person capacity, J&J's actual damages are at least $6,000, which was the price for a sublicense to exhibit the Program at the Bar. This is a significant sum. Further, the Court again acknowledges that in the context of signal piracy, "the availability of unauthorized access to the program reduces demand and depresses the prices that [plaintiff] can charge for sublicenses." *Kingvision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 442 (S.D.N.Y. 2001). Thus, this factor weighs in favor of enhanced statutory damages.

The fourth factor weighs heavily in favor of enhanced statutory damages. J&J's investigators observed that the Bar advertised the Program using signage outside its establishment that showed images of the Program's main-event fighters and included the invitation "Welcome Fights Fans." ECF No. 27 at 8. Adjacent to the Bar's front door, the Bar placed a full-sized, standing cardboard cutout that likewise depicted the fighters. *Id.* The Bar's tables were adorned with promotional table tents advertising the Program. *Id.* And one of J&J's investigators identified an online Facebook post by the Bar advertising its intent to show the Program "that evening[]." ECF No. 34-1 at 15. It is clear to the Court that this advertising required volitional action, and that these actions were taken in hopes of attracting patrons to the Bar. The Court therefore believes that the fourth factors weighs heavily in favor of enhanced statutory damages.

The fifth and sixth factors weigh against enhanced statutory damages because it does not appear that the Bar charged a cover nor a premium for its food or drinks.

After weighing the *Kingvision* factors, the Court recommends that the district judge award $30,000 in enhanced statutory damages. This award is consistent with other awards in and

outside our circuit. The Court's judgment in *Joe Hand Promotions, Inc. v. Juarez*, provides an analogous example. 2011 WL 284503, at *3–4 (E.D. Cal. Jan. 26, 2011). There, the Court awarded $40,000 in enhanced statutory damages (in addition to $10,000 in statutory damages) after finding that defendant displayed an intercepted program on 2 screens, that defendant's 72-person-capacity bar drew 60 patrons on the night of the program, and that defendant was a repeat violator. *Id.* Here, the Bar had a 120- or 125-person capacity and was approximately 92–95% full by the Program's end. Further, the Bar displayed the Program on 9 screens, which is nearly five times as many as the 2 screens used by the *Juarez* defendant. And although J&J did not establish that Kosak was a repeat violator, it did establish that the Bar advertised the Program, which is something that the *Juarez* plaintiff apparently did not do.

A similar award for enhanced statutory damages is found in *Joe Hand Promotions, Inc. v. Wing Spot Chicken & Waffles, Inc.*, 920 F. Supp. 2d 659 (E.D. Va. 2013). There, the Court awarded $27,000 in enhanced statutory damages after it found that the cost to exhibit the intercepted program was $1,100. *Id.* at 668–69. Further, the *Wing Spot* defendant exhibited the program to 37–41 patrons—which was less than 60% of its 75-person capacity—and defendant was not a repeat violator, did not experience substantial financial gain, and did not advertise or charge a cover or premium for food or drinks. *Id.* Here, J&J has similarly failed to establish substantial financial gain, a cover charge, or a premium for food or drinks. However, J&J's sublicense fee for the Program was greater than the fee in *Wing Spot*, and the Bar here had a larger capacity and hosted a numerically and proportionally larger number of patrons. Further, unlike in *Wing Spot*, J&J has established that the Bar here advertised the intercepted Program.

A final example is found in *J&J Sports Prods., Inc. v. McCausland*, 2012 WL 113786 (S.D. Ind. Jan. 13, 2012). The *McCausland* court awarded plaintiff $30,000 in enhanced statutory damages after it found that the violation occurred in a 50-person-capacity bar, the intercepted program was shown to 12–17 patrons on a single 60-inch screen, and defendant was not a repeat violator, did not charge a cover or premium for food or drinks, and did not advertise an intent to show the program. *Id.* at 2–4. In contrast, the Program here was shown on substantially more screens in a substantially larger bar with substantially more patrons. Like the *McCausland*

defendant, Kosak is not a repeat violator and he did not charge a cover or premium for food or drinks. And unlike the *McCausland* defendant, the Program here was advertised online and at the Bar, which makes Kosak's conduct more egregious.

In sum, the Court recommends an award to J&J of $30,000 in enhanced damages.

**E.  Attorneys' fees**

J&J also moves for an award of costs and reasonable attorneys' fees. The Communications Act provides that the Court "shall direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." 47 U.S.C. § 605(e)(3)(B)(iii). Based on the Court's recommendations, the Court will recommend to the district judge that J&J be granted the opportunity to submit its request for costs and attorneys' fees within 14 days from entry of judgment. *See* LR 54-1; LR 54-14.

**V.  Conclusion**

IT IS THEREFORE RECOMMENDED that J & J Sports Productions, Inc.'s motion for summary judgment be GRANTED in part and DENIED in part.

IT IS RECOMMENDED that as to Count I, summary judgment be GRANTED in favor of plaintiff and against Kosak in the total amount of $38,000.

IT IS RECOMMENDED that as to Count II, summary judgment be DENIED.

IT IS RECOMMENDED that plaintiff be granted an opportunity to submit its request for costs and attorneys' fees within 14 days from entry of judgment.

DATED: September 11, 2020.

BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

This report and recommendation ("R&R") is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this R&R may file a written objection supported by points and authorities within fourteen days of being served with this R&R. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).